**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MG Pharmacy, LLC,<br><br>                   Plaintiff,<br>vs.<br><br>Cardinal Health 110 LLC, et al.,<br><br>                 Defendants. | No. CV-21-01747-PHX-SPL<br><br>**ORDER ON PRELIMINARY INJUNCTION** |

Before the Court is Plaintiff MG Pharmacy LLC's ("Plaintiff") Motion for Preliminary Injunction against Defendants Cardinal Health 110 LLC and Cardinal Health 112 LLC (collectively, "Defendant"). (Doc. 2). Plaintiff seeks a preliminary injunction ordering Defendant to perform under the parties' distribution contract. After reviewing the parties' briefing (Docs. 2, 14, 21), the parties' stipulated facts (Doc. 23), and holding an evidentiary hearing on October 29, 2021, the Court enters this Order granting Plaintiff's request for preliminary injunction.

**I.    BACKGROUND**

Plaintiff MG Pharmacy LLC is a local, family-owned pharmacy operating in Phoenix, Arizona. (Doc. 1 at 1). Plaintiff is licensed to operate a retail pharmacy and is a member of the American Associated Pharmacies ("AAP"). (Doc. 23 at 2). AAP has contracted with Defendants Cardinal Health 110 LLC and Cardinal Health 112 LLC through a series of Prime Vendor Agreements "to serve as the primary supplier for its members." (Doc. 2 at 21). Plaintiff, as an AAP member, has entered into several Member

Certification Agreements with Defendant to purchase pharmaceutical products from Defendant. (*Id.*). On March 15, 2019, Plaintiff entered its most recent Member Certification Agreement with Defendant. (*Id.*). The March 2019 Agreement "incorporates by reference" a Prime Vendor Agreement between AAP and Defendant dated September 1, 2018 (the Court will refer to the September 2018 and March 2019 agreements, collectively, as "the Agreement"). (Doc. 1 at 2).

Under the Agreement, Plaintiff agreed to purchase—and Defendant agreed to supply—pharmaceutical products, including both controlled and non-controlled substances. (*Id.* at 2–3). The Agreement provides that:

> Cardinal Health may, in its sole discretion, immediately suspend, terminate, or limit the distribution of controlled substances, listed chemicals, and other products monitored by Cardinal Health at any time if Cardinal Health believes that the continued distribution of such products to the Member may pose an unreasonable risk of the diversion of such products based on the totality of the circumstances and such other considerations as may be deemed relevant by Cardinal Health.

(Doc. 14 at 24). It is undisputed that, since 2013, Defendant has permitted Plaintiff to order up to 3,500 dosage units of oxycodone 15 mg and 30 mg tablets per month. (Doc. 23 at 2). This distribution limit was set following a 2012 settlement agreement between the parties after Plaintiff obtained a preliminary injunction against Defendant ordering Defendant to resume distribution of controlled substances. (*Id.*).

On September 13, 2021, Defendant informed Plaintiff that it would no longer be supplying Plaintiff with any controlled substances nor certain non-controlled substances. (Doc. 1 at 3). Shortly thereafter, Defendant retracted, and distributions were reinstated. (*Id.*). However, on September 20, Defendant again informed Plaintiff that distributions of all controlled and certain non-controlled substances were terminated. (*Id.*). According to Plaintiff, Defendant determined termination was necessary because Plaintiff "had filled too many prescriptions for oxycodone from a single prescriber" and because Defendant doubted the validity of that prescriber, a nurse practitioner from a nearby pain clinic. (*Id.*). On September 29, Defendant's counsel confirmed to Plaintiff that distributions would not

be resumed because they posed "an unreasonable risk of diversion." (*Id.* at 4–5).

In addition to the quantity of oxycodone being prescribed and the nurse practitioner's validity, Defendant was also concerned with the type of oxycodone prescriptions being filled. Specifically, Defendant alleges that "more than 98% of the oxycodone being purchased by MG Pharmacy was for the 15mg or 30mg IR strengths," which, according to Defendant, are formulations "susceptible to greater risk of diversion." (Doc. 14 at 5–6). Despite Defendant's concerns, the parties stipulate that no governmental agency has found that Plaintiff is diverting controlled substances. (Doc. 23 at 3). The parties further agree that Defendant has "no facts to prove [Plaintiff] has ever actually diverted controlled substances." (*Id.*).

On October 14, 2021, Plaintiff filed suit against Defendant in this Court. In its Complaint, Plaintiff alleges breach of contract and tortious interference with business contracts and business expectations. (Doc. 1 at 11–12). Plaintiff seeks a declaratory judgment stating, among other things, that Defendant violated the implied covenant of good faith and fair dealing and that Plaintiff has a right under the Agreement to have distributions resume. (*Id.* at 8). Plaintiff further seeks specific performance and injunctive relief requiring Defendant to reinstate the Agreement and resume distribution. (*Id.* at 11). That same day, Plaintiff also filed a Motion for Temporary Restraining Order and Preliminary Injunction seeking injunctive relief ordering Defendant to resume distributions to Plaintiff. (Doc. 2). This Court denied the temporary restraining order. (Doc. 8). The Court now rules on Plaintiff's request for a preliminary injunction.

**II.    LEGAL STANDARD**

A party seeking injunctive relief under Rule 65 of the Federal Rules of Civil Procedure must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.[1] *Winter v. Nat. Res. Def. Council, Inc.*,

---

[1] The Ninth Circuit observes a "sliding scale" approach, in that these elements "are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

555 U.S. 7, 20 (2008); *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014); *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "The basic function of a preliminary injunction is to preserve the *status quo* pending a determination of the action on the merits." *Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988).

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation omitted) (citation omitted). Where the movant seeks a mandatory injunction, rather than prohibitory, injunctive relief is "subject to a heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).[2]

### III. DISCUSSION

Here, Plaintiff has demonstrated a likelihood that it will succeed on the merits. As noted above, the Agreement provides that Defendant has "sole discretion" to terminate distributions if it "believes that the continued distribution . . . may pose an unreasonable risk of diversion . . . based on the totality of the circumstances and such other considerations as may be deemed relevant by [Defendant]." (Doc. 14 at 24). Defendant argues that Plaintiff is unlikely to succeed on the merits because this sole discretion clause is fully enforceable, and Defendant merely acted in accordance with it. (*Id.* at 9–10). Plaintiff does not challenge the clause's enforceability, but instead argues that the doctrine of good faith

---

Thus, by example, an injunction can issue where there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

[2] "A mandatory injunction orders a responsible party to take action," while "a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). "The 'status quo' refers to the legally relevant relationship between the parties before the controversy arose." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060–61 (9th Cir. 2014).

4

and fair dealing applies, and that Defendant failed to act in good faith when it exercised its discretion and terminated distributions because it had no basis to believe that Plaintiff posed an "unreasonable risk of diversion." (Doc. 2 at 13–14). Defendant responds that the doctrine of good faith and fair dealing is inapplicable and that, even if it did apply, it acted in good faith when it terminated distributions. (Doc. 14 at 10–14).

Under Ohio law, "every contract contain[s] an implied duty for the parties to act in good faith and to deal fairly with each other" and a party who fails to act in good faith "can be found to have breached [the] contract." *Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ohio Ct. App. 2005); *see also Summitcrest, Inc. v. Eric Petroleum Corp.*, 60 N.E.3d 807, 820 (Ohio Ct. App. 2016) ("[U]nder Ohio case law, it is well-established that every contract has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract."). This Court finds that the duty of good faith and fair dealing is applicable to the present contract, including the sole discretion clause. Thus, while Defendant had "sole discretion" to terminate distributions if it believed that Plaintiff posed an unreasonable risk of diversion, Defendant's exercise of that contractual right had to be in good faith—that is, it had to be honest and reasonable. If it was not, Defendant could be found to have breached the contract.

Defendant argues that it acted in good faith because it had valid diversion concerns that justified its decision to terminate distributions. (Doc. 14 at 13). It is true Defendant has demonstrated that certain "red flags"—identified by the DEA as factors that may indicate a risk of diversion—were present when it chose to terminate distribution. (*Id.*). First, a high ratio—98 percent—of the oxycodone prescriptions being filled by Plaintiff were of the 15 mg and 30 mg varieties, which Defendant asserts are the strongest and most abused forms of the drug. (*Id.*). Second, a single prescriber, Nurse Practitioner Lisa Wakefield, issued a disproportionately large amount of those prescriptions for controlled substances. (*Id.*).

However, it is unclear whether these two "red flags" alone were enough to give Defendant a good faith basis to believe there was an unreasonable risk of diversion. The parties stipulate that Defendant has no facts to prove Plaintiff ever actually diverted

controlled substances. (Doc. 23 at 3). Further, there is no evidence indicating that the DEA, the Arizona Board of Pharmacy, or any other government agency is investigating Plaintiff or otherwise harbors any concern that Plaintiff has diverted controlled substances. (*Id.*). Plaintiff's orders of controlled substances had been consistent for years and were well within the parties' agreed-upon limits. (Hearing Tr. at 29:15–30:17)[3]. Plaintiff was fully licensed and certified and had multiple safeguards in place to ensure that prescriptions for controlled substances were monitored closely. (Doc. 1 at 2; Hearing Tr. at 24:2–24:7, 29:15–35:19, 88:14–88:17). Plaintiff's Pharmacist in Charge, Dr. David Gortler, is highly credentialed, having spent time as a Senior Advisor to the FDA Commissioner and as an Assistant Professor of Pharmacology at both Yale University and Georgetown University. (Doc. 2 at 32–37). Even Defendant's concerns about Nurse Practitioner Wakefield appear unfounded. Wakefield is fully licensed to practice medicine and has never been suspended or investigated in any way. (Hearing Tr. at 41:13–41:23). She works at Canyon Pain Center, a pain clinic located near Plaintiff. (*Id.* at 41:25). According to Wakefield, the policies at Canyon Pain Center require monthly urine testing, random pill counts, and surveys to determine each patient's risk for controlled substance abuse. (*Id.* at 47:13–48:21).

Defendant also argues that its good faith was shown when Defendant—facing concerns that Plaintiff was diverting—acted first by "reaching out to [Plaintiff] and asking for additional information." (Doc. 14 at 12). This is undermined by the record, which shows that Defendant—through Patrick Dudley, Defendant's Director of Quality and Regulatory Management—first reached out to Plaintiff on September 13, 2021. (Doc. 23 at 2). Instead of asking for additional information, however, Mr. Dudley informed Plaintiff that Defendant was cutting off its supply of controlled substances to Plaintiff because Plaintiff was "ordering too much oxycodone." (Hearing Tr. at 79:18–80:2). And while there is some

---

[3] Hearing Transcript refers to the transcript of the preliminary injunction hearing held before this Court on October 29, 2021.

confusion over what happened after that[4], it is undisputed that on September 20, 2021, Defendant again contacted Plaintiff and informed Plaintiff that distributions were being terminated. (Doc. 23 at 2). According to Plaintiff, Defendant never engaged in any "discourse or a dialogue" with Plaintiff, nor did Defendant ever ask for an explanation or for any data related to the diversion concerns. (Hearing Tr. at 143:24–144:6). There is no evidence that Defendant attempted to investigate or validate its diversion concerns before terminating distribution. There is no evidence that Defendant reported its diversion concerns to DEA, to the Arizona Board of Pharmacy, or to any other regulatory body. And outside of the two phone calls with Plaintiff, there is no evidence that Defendant visited or otherwise contacted Plaintiff or Nurse Practitioner Wakefield regarding its diversion concerns. Instead, it appears that Defendant acted abruptly or even impulsively in terminating distributions. At the least, Defendant has failed to substantiate its claim that it first attempted to work with Plaintiff in sorting through its diversion concerns.[5]

All told, the record lacks evidence to suggest Plaintiff posed an unreasonable risk of diversion. Nonetheless, Defendant terminated distributions. This Court believes that a reasonable jury could find that Defendant failed to act in good faith and breached the contract when it did so. Plaintiff has shown a likelihood of success on the merits.[6]

---

[4] Plaintiff recalls speaking with Ryan Thakur—one of Plaintiff's contacts with Defendant—who allegedly told Plaintiff that there were no issues, that Plaintiff would continue receiving its supply, and that Plaintiff "never should have been cut off in the first place." (Hearing Tr. at 80:6–81:6). Plaintiff also states that Thakur requested certain information from Plaintiff, including the address of Nurse Practitioner Wakefield. (*Id.* at 83:13–84:14). Defendant responded that it was not familiar with Plaintiff's conversation with Thakur and that this was the first time it had heard about it. (*Id.* at 168:10–169:14).

[5] As a final showing of its purported good faith, Defendant points to the fact that it told Plaintiff that it would "resume distributions if [Plaintiff] could secure written confirmation from DEA and the Arizona Board of Pharmacy that there are no diversion concerns." (Doc. 14 at 13). According to Plaintiff, however, such confirmations are impossible to obtain; for example, when Plaintiff contacted the Arizona Board of Pharmacy, he was told that they do not offer inspections for the purpose of confirming that there are no diversion concerns. (Hearing Tr. at 108:3–108:15, 158:6–158:23).

[6] Defendant makes two alternative arguments to support its contention that Plaintiff fails to show a likelihood of success on the merits. First, Defendant asserts that Plaintiff

As to the second required element for a preliminary injunction, this Court finds that Plaintiff has shown that irreparable harm will result absent an injunction. To show irreparable harm, "a plaintiff must demonstrate immediate threatened injury." *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Id.* (citing *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984)). A finding of irreparable harm also requires a finding that legal remedies, such as damages, are inadequate. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974))). "Courts can consider economic hardship, actual or threatened loss of customers, business reputation, and goodwill in determining the presence and sufficiency of irreparable harm." *Krueger Invs., LLC v. Cardinal Health 110, Inc.*, No. CV 12-618-PHX-JAT, 2012 WL 3028349, at *5 (D. Ariz. July 24, 2012) (citations omitted).

Here, Plaintiff argues that—absent an injunction—the pharmacy's reputation will be damaged, and the business will lose customers and substantial revenue. (Doc. 2 at 15–16). Plaintiff asserts that Defendant's determination that Plaintiff presents an unreasonable risk of diversion damages its reputation as a pharmacy—not only with customers and prescribers, but with any other distributor with whom Plaintiff may seek to establish a

---

agreed not to sue Defendants for exercising their discretion to terminate distributions. (Doc. 14 at 14). While there was a "covenant not to sue" attached as an independent document to the contract, Plaintiff never signed or executed it. (Hearing Tr. at 158:7–159:3).

Second, Defendant asserts that it was entitled to terminate the contract because of a lapse in Dr. Gortler's license. (Doc. 14 at 14). While Dr. Gortler admits that his license expired, he claims that it was only an oversight and that the issue was addressed in a timely manner. (Hearing Tr. at 87:14–88:13). Moreover, the lapse occurred in late 2016 and was addressed by Dr. Gortler in early 2017, well before the current Agreement between the parties was even in existence. (*Id.*). The Court is not persuaded by either of Defendant's alternative arguments.

relationship. (*Id.*). And because Plaintiff is cut off from a substantial portion of its pharmaceutical supply, customers will be forced to go elsewhere to obtain the prescriptions they need. According to Plaintiff, once these customers leave, they are unlikely to return. (Hearing Tr. at 72:11–72:25); (Doc. 2 at 2). Additionally, once prescribers receive word that Plaintiff no longer carries certain prescriptions, they will send their patients elsewhere. (Doc. 2 at 16). All told, Dr. Gortler testified that, without an injunction, the pharmacy would lose approximately 50 percent of its revenue from the loss of customers. (Hearing Tr. at 73:22). And given that the pharmacy's other expenses—such as rent, utilities, and payroll—would remain the same, Dr. Gortler testified that the business would likely be forced into bankruptcy within a matter of months. (*Id.* at 73:18–74:13). Plaintiff argues that legal remedies, such as damages, will not suffice because they will come too late to save the business. (Doc. 2 at 16). And even if the business survived, Plaintiff argues that the loss of future customers and the damage to the pharmacy's reputation are injuries which cannot be remedied by damages alone.

Defendant counters that Plaintiff offers only speculation and unsupported assertions to prove irreparable harm. (Doc. 14 at 15). Defendant analogizes to *Krueger*, a factually similar case in which the District of Arizona denied injunctive relief, in part because the plaintiffs "failed to demonstrate sufficient irreparable harm in the absence of an injunction." *Krueger*, 2012 WL 3028349, at *5. In that case, the plaintiff pharmacy was also seeking an injunction ordering the defendant supplier to resume distribution of pharmaceutical products. *Id.* at *4. The *Krueger* plaintiffs argued that their business would be unable to survive without the supply of controlled substances. *Id.* at *5. The court, however, found that the plaintiffs "failed to substantiate this claim by showing that their business [could not] continue based on either the sale of non-controlled substances alone or in combination with their other suppliers of controlled substances." *Id.* The court noted that there were other large pharmaceutical wholesalers which had "either conditionally accepted or [were] still considering Plaintiffs' request for an alternative supplier." *Id.* The plaintiffs "failed to introduce non-conclusory evidence related to unquantifiable harm such

9

as loss of customer relationships or damaged reputation." *Id.* at *6. In the end, the *Krueger* court was unpersuaded by the plaintiffs' argument and found that irreparable harm had not been shown. *Id.* Here, Defendant argues that Plaintiff has also failed to provide any specifics to support its claims that it has already had to turn away customers or that Plaintiff will have no business to conduct without a supply of controlled substances. (Doc. 14 at 15). Defendant further argues that Plaintiff's harms are not irreparable because money damages would suffice to remedy them. (*Id.* at 16).

This Court is unpersuaded by Defendant's arguments. Plaintiff is a small, family business with a small volume of customers. (Hearing Tr. at 22:16–25:9). The pharmacy is only about 400 square feet, and Plaintiff is unable to stock its shelves with the retail goods that larger, national chain pharmacies do. (*Id.*). Plaintiff therefore receives the bulk of its revenue from prescription sales. (*Id.*). Plaintiff's customer base is almost entirely local, and most of its customers have been going to Plaintiff for their prescription needs for years or even decades. (*Id.* at 24:15–25:9). Most importantly, even though only ten percent of Plaintiff's customers are prescribed to a controlled substance, most of those customers are also prescribed to numerous other drugs. (*Id.* at 63:1–63:12, 65:8–65:12). This means that if those customers go elsewhere, Plaintiff will lose far more revenue than the ten percent figure might suggest. As Dr. Gortler testified, Plaintiff would lose approximately 50 percent of its revenue if Plaintiff is forced to move forward without its supply. (*Id.* at 106:12–106:20). Given the small size and low customer volume of Plaintiff's business, such a loss would be detrimental to the pharmacy. Moreover, Plaintiff asserts that obtaining a new supplier would take significant time due to regulations and lengthy review processes. (*Id.* at 107:18–108:2). This is different than what faced the plaintiffs in *Krueger*, as they had already received conditional acceptances from alternative wholesalers and were awaiting the consideration of others. *Krueger*, 2012 WL 3028349, at *5. Here, Plaintiff has no such hopes for relief and—absent an injunction—will have to survive without a substantial portion of its pharmaceutical supply for a potentially significant length of time while the litigation between these two parties plays out.

This Court acknowledges the difficulties in projecting future lost sales and customers. This lack of data does not, however, mean that Plaintiff has entirely failed to introduce evidence of irreparable harm and that this Court must conclude as the *Krueger* court did. Instead, this Court finds that Plaintiff has shown sufficient evidence that, without an injunction, it will suffer damage to its reputation and to its relationships with its customers. *See Stuhlbarg Int'l Sales Co., Inc.*, 240 F.3d at 841 ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."). Further, Plaintiff has shown that its small size and low customer volume means that its business would be unlikely to survive without its supply of controlled and some non-controlled substances. *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("The threat of being driven out of business is sufficient to establish irreparable harm."). Plaintiff has sufficiently shown that irreparable harm is likely if an injunction is not issued.

As to the third required element for a preliminary injunction, this Court finds that Plaintiff has shown that the balance of hardships tips in its favor. When analyzing this element, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24; *see also Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) ("In evaluating the balance of hardships a court must consider the impact granting or denying a motion for [an] injunction will have on the respective enterprises.").

Here, an injunction requiring Defendant to resume distribution to Plaintiff would only require the parties to return to the purchaser-supplier relationship that existed for years. The pharmaceutical products for Plaintiff are presumably accessible in Arizona, given that Defendant only stopped supplying Plaintiff in September and that Defendant continues to supply other pharmacies in the state. Moreover, Plaintiff will still be required to pay Defendant the contractually agreed upon prices for the products. Thus, there is no obvious hardship facing Defendant's business if an injunction is issued.

If ordered to resume distributions, Defendant argues that it will "risk liability,

including potential suspension of its DEA registration, for providing [Plaintiff] with controlled substances after concluding that doing so may pose an unreasonable risk of diversion." (Doc. 14 at 2). The Court finds this argument to be overstated under these circumstances. There is no evidence that Plaintiff has ever diverted controlled substances. Nor is there evidence that Plaintiff has even been investigated for diversion at any point. Plaintiff has several safeguards in place to monitor controlled substances, including the electronic prescribing software system and the Prescription Drug Monitoring Program. (Doc. 1 at 4). Plaintiff is fully licensed, certified, and in compliance with all relevant government authorities and with the terms of the parties' contract. All told, the record suggests that Defendant would not be placed in any serious regulatory danger if it were required to resume distributions to Plaintiff.

On the other hand, if the injunction is not granted, Plaintiff has shown that it will likely suffer great hardship. Without its supply of controlled and some non-controlled substances, Plaintiff stands to lose customers, suffer reputational damage, and ultimately be at risk of bankruptcy. Plaintiff has also shown that it will take significant time to secure a new supplier, if it is even possible at all. This Court finds that the balance of hardships tips in favor of Plaintiff.

Finally, this Court finds that a preliminary injunction is in the public's interest. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Pure Wafer Incorp. v. City of Prescott*, 275 F. Supp. 3d 1173, 1179 (D. Ariz. 2017) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). "The public interest analysis for the issuance of a[n] injunction requires [the court] to consider whether there exists some critical public interest that would be injured by the grant of [injunctive] relief." *Pure Wafer Incorp.*, 275 F. Supp. 3d at 1179 (citation omitted). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002).

Although this Court recognizes the public's interest in preventing the diversion of

dangerous drugs, it believes that denying the injunction here would do little to serve that interest because there is no evidence that Plaintiff was diverting controlled substances. *See Pure Wafer Incorp.*, 275 F. Supp. 3d at 1179 (citation omitted) ("With regard to the likely public interest consequences of the injunction, 'such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence.'").

On the other hand—and as Plaintiff points out—there is a public interest in commercial integrity and in the protection of legal rights. *Core Laboratories LP v. Spectrum Tracer Servs., LLC*, 532 Fed.Appx. 904, 910–11 (Fed. Cir. 2013). This interest is served by an injunction that requires Defendant to resume distributions to Plaintiff, in the spirit of the parties' contract. Furthermore, an injunction serves the public's interest in protecting small, family-owned businesses and the local economy. Finally, an injunction protects the public's interest in obtaining prescriptions from the pharmacy of its choice. As noted above, most of Plaintiff's customers are local, and many have relied on Plaintiff for their prescription needs for years or even decades. An injunction protects the interests of such individuals.

Accordingly, because the public's interest in preventing the diversion of controlled substances is not harmed here—and because other public interests are more directly implicated—this Court finds that Plaintiff has demonstrated that an injunction is in the public interest.

### IV.  CONCLUSION

For the reasons discussed above, Plaintiffs have met their burden of demonstrating that they are entitled to a preliminary injunction requiring Defendants to resume distribution under the Agreement.

Therefore,

**IT IS ORDERED** that the parties' Stipulated Facts (Doc. 23) is **granted** and adopted by the Court.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Preliminary Injunction (Doc. 2) is **granted**.

**IT IS FURTHER ORDERED** that the Court enters a preliminary injunction as follows:

1. Defendant is immediately to begin to distribute to Plaintiff the sale of controlled and non-controlled substances that were stopped by Defendant prior to the filing of Plaintiff's Complaint.
2. This Order is effective immediately, subject to Plaintiff posting a bond in the amount of $500.00, which can be satisfied by deposit of that sum into the Court's account within forty-eight hours of the issuance of this Order. If that sum is deposited within forty-eight hours of the issuance of this Order, this Order shall remain in full force and effect.
3. If new facts arise following the entry of this Order that support a request by Defendant to modify or vacate this Order, Defendant may submit a request for an emergency hearing requesting the Order be modified or vacated based on new facts. The hearing, if granted, will address only the new facts asserted.

Dated this 4th day of November, 2021.

Honorable Steven P. Logan
United States District Judge